**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| JASON AND JENNIFER TUCKER, individually and as parents of J.T., a minor, <br><br> Plaintiffs, <br><br> vs. <br><br> QUALITY EGG, LLC, d/b/a "Wright County Egg," an Iowa limited liability company; <br><br> Defendant. | Case No. 3:10-cv-03060-MWB <br><br> **COMPLAINT** <br><br> **JURY DEMAND** |

COME NOW the plaintiffs, Jason and Jennifer Tucker, individually and as parents of J.T., a minor, for a cause of action against defendant Quality Egg, LLC to respectfully allege as follows:

## I.  PARTIES, JURISDICTION, AND VENUE

1. Jason and Jennifer Tucker, husband and wife, are the natural parents of J.T., a minor child, and all are residents of Sachse, Texas.

2. The defendant Quality Egg, LLC, d/b/a "Wright County Egg" is an Iowa limited liability company, and citizen of Iowa, that, at all times relevant, was engaged in the business of manufacturing and distributing shell eggs to customers nationally, including food retailers for resale, and is located at 2674 Highway 69, Galt, Iowa, 50101.

3. Subject matter jurisdiction in this matter is proper based on the diversity of the parties, and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), both as required under 28 U.S.C. §1332(a)(2).

4. Venue of this matter is proper in the United States District Court for the Northern District of Iowa, Western Division, pursuant to 28 U.S.C. §1391(a), as a substantial part of the events or omissions giving rise to the claim set forth herein occurred in this judicial district.

## II. GENERAL FACT ALLEGATIONS

**The Outbreak and Wright County Egg's Recalls**

5. On August 16, 2010, the Centers for Disease Control and Prevention (CDC) announced that it had observed an approximate four-fold nationwide increase, in late June and early July 2010, in reports of human illnesses caused by *Salmonella* enteritidis.

6. On August 13, 2010, the defendant Wright County Egg issued a recall of approximately 228,000,000 shell eggs that it had manufactured and distributed in recent months. Wright County Egg had distributed the recalled eggs to food wholesalers, distribution centers, and foodservice companies in California, Illinois, Missouri, Colorado, Nebraska, Minnesota, Wisconsin and Iowa. In turn, the companies that Wright County Egg had distributed to further distributed and sold the recalled eggs.

7. On August 16, 2010, the same day as the CDC's announcement described at paragraph 5 of this complaint, Wright County Egg expanded the recall described at paragraph 6 of this complaint to include approximately 380,000,000 eggs.

8. In the days following Wright County Egg's recalls, numerous state health departments, including the California Department of Health, announced illnesses amongst state residents linked to eggs and egg products sold by Wright County Egg.

9. The Food and Drug Administration's (FDA) Department of Health and Human Services began an investigation into Wright County Egg's egg manufacturing facilities in Galt,

Iowa, including on-site inspections at its various egg laying farms/plants between August 12 and August 30, 2010.

10. The FDA's observations from its on-site inspections are contained in FDA Form 483, issued to Wright County Egg's Chief Operating Officer, Peter A. DeCoster, on August 30, 2010, and include the following findings:

> 10.1. Chicken manure located in the manure pits below the egg laying operations was observed to be approximately 4 feet high to 8 feet high at the following locations: Layer 1 – House 1; Layer 3 – Houses 2, 7, 17, and 18. The outside access doors to the manure pits at these locations had been pushed out by the weight of the manure, leaving open access to wildlife or domesticated animals.
>
> 10.2. Un-baited, unsealed holes appearing to be rodent burrows located along the second floor baseboards were observed inside Layer 1 – Houses 1-9 and 11-13; Layer 2 – Houses 7 and 11; Layer 3 – Houses 1, 3, 4, 5, and 6; Layer 4 – House 3.
>
> 10.3. Dark liquid which appeared to be manure was observed seeping through the concrete foundation to the outside of the laying houses at the following locations: Layer 1 – Houses 1, 2, 3, 4, 5, 8, 11, 12, and 14; and Layer 3 – Houses 1, 8, 13, and 17.
>
> 10.4. Standing water approximately 3 inches deep was observed at the southeast corner of the manure pit located inside Layer 1 – House 13.
>
> 10.5. Un-caged birds (chickens having escaped) were observed in the egg laying operations in contact with the egg laying birds at Layer 3 – Houses 9 and

-3-
Case 3:10-cv-03060-MWB   Document 2   Filed 10/26/10   Page 3 of 13

16. The un-caged birds were using the manure, which was approximately 8 feet high, to access the egg laying area.

10.6. Layer 3 – House 11, the house entrance door to access both House 11 and 12 was blocked with excessive amounts of manure in the manure pits.

10.7. There were between 2 to 5 live mice observed inside the egg laying Houses 1, 2, 3, 5, 7, 9, 10, 11, and 14.

10.8. Live and dead flies too numerous to count were observed at the following locations inside the egg laying houses: Layer 1 – Houses 3, 4, 6, 8, 9, 11, and 12; Layer 2 – Houses 7 and 11; Layer 3 – Houses 3, 4, 4, 5, 7, 8, 15, 16, 17, and 18. The live flies were on and around egg belts, feed, shell eggs and walkways in the different sections of each egg laying area. In addition, live and dead maggots too numerous to count were observed on the manure pit floor located in Layer 2 – House 7.

10.9. You did not document washing and disinfecting of your dead hen truck and manure equipment prior to moving from farm to farm.

10.10. You did not maintain records documenting the washing and disinfection of the trailers used for the movement of pullets to laying houses.

10.11. Birds were observed roosting and flying, chicks heard chirping in the storage and milking facilities. In addition, nesting material was observed in the feed mill closed mixing system, ingredient storage and truck filling areas.

10.12. Outdoor whole kernel corn grain bins 4 and 6 observed to have the topside doors/lids open to the environment and pigeons were observed entering

and leaving these openings. Birds were also observed sitting/flying around and over the openings.

10.13. Samples collected during the course of this inspection and tested by an FDA laboratory revealed the following positive analytical results for *Salmonella* Enteritidis:

10.13.1 On 8/13/2010, an environmental sample was collected from Layer 2, house 7 manure swab from row 1 – left side.

10.13.2 On 8/16/2010, an environmental sample was collected from Layer 2, house 11 at manure scraper blade from row 3 – right side.

10.13.3 On 8/13/2010, an environmental sample was collected from Layer 4, house 3 at walkway 1 – right side and walkway 3 – right side.

10.13.4 On 8/14/2010, a sample of meat and bone meal was collected from ingredient bin 7 located at your feed mill.

10.13.5 On 8/17/2010, a sample of finished feed "Developer" pullet feed was collected from the feed mill.

10.13.6 On 8/16/2010, an environmental sample was collected from the roof level covered ingredient bin chute 8; Second Floor ingredient bin cover 19 (ingredient bin 19 holds ground corn) located at your feed mill.

11. As of October 21, 2010, the CDC has linked approximately 1,813 illnesses to the *Salmonella* enteritidis egg outbreak.

**J.T.'s *Salmonella* Illness**

12. On or about June 26, 2010, Jennifer Tucker's mother purchased Lucerne eggs at a Tom Thumb grocery store in Texas.

13. On or about July 5, 2010, the minor plaintiff, J.T., consumed cake made from the Lucerne eggs.

14. On or about July, 7, 2010, the minor plaintiff, J.T., began to suffer from severe fevers, including abdominal cramps, nausea, diarrhea and vomiting. J.T. continued to be ill with gastrointestinal symptoms for several days thereafter.

15. On or about July 20, 2010, after receiving a call from his pre-kindergarden teacher who stated that J.T. was pale, shivering, and refusing to eat, Jennifer Tucker took J.T. to Children's Medical Center at Legacy. Due to J.T.'s complaints of pain in his right hip, x-rays were done of that area. He was ultimately diagnosed with constipation and right hip pain.

16. J.T.'s symptoms continued to worsen, however, causing his mother to take him back to the hospital the very next day. The decision was made to admit him for treatment and close monitoring.

17. During his hospitalization, J.T. was treated for extremely high fevers and hip pain. It was ultimately discovered that a bone in his right hip, and the tissues surrounding it, had become infected as a result of the Salmonella enteritidis bacteria that J.T. had ingested on or about July 5, 2010, in cake made from eggs manufactured by the defendant. J.T. remained hospitalized until he was deemed sufficiently stabilized, and was discharged on or about July 28, 2010. Thereafter, J.T. has suffered from significant pain as a result of the septic illness, and bone infection, that resulted from his Salmonella enteritidis infection.

### III.  STRICT PRODUCT LIABILITY

18. The defendant was at all times relevant to this matter the manufacturer and seller of the adulterated food product that is the subject of the action.

19. The adulterated food product that the defendant manufactured, distributed, and sold was, at the time it left the defendant's control, defective and unreasonably dangerous for its ordinary and expected use because it contained *Salmonella*, a deadly pathogen.

20. The adulterated food product the defendant manufactured, distributed, and sold was delivered to the plaintiff without any change in its defective condition. The adulterated food product the defendants manufactured, distributed, and sold was used in the manner expected and intended, and was consumed by the plaintiff, J.T.

21. The plaintiffs suffered injury and damages as a direct and proximate result of the defective and unreasonably dangerous condition of the adulterated food product that the defendant manufactured, distributed, and sold. These damages include, but are not limited to: physical and mental pain and suffering, past and future in the form of the pain and suffering including bodily suffering, discomfort and loss of enjoyment of life; and medical costs and expenses to this point and the present value of reasonable medical expenses in the future.

WHEREFORE, the plaintiffs request damages in an amount that will reasonably compensate them for the said injuries and damages, together with interest and costs, as permitted under Iowa law.

### IV.  BREACH OF WARRANTY

22. The plaintiffs replead the allegations set forth in paragraph 1 through 21 above and incorporate same as if set forth fully herein.

23. The defendant Wright County Egg is liable to the plaintiffs for breaching express and implied warranties it made regarding the adulterated product that the minor plaintiffs' grandmother purchased. These express and implied warranties included the implied warranties of merchantability and fitness for a particular use. Specifically, the defendant Wright County Egg expressly warranted, through its sale of food to the public and by the statements and conduct of its employees and agents, that the food it prepared and sold was fit for human consumption and not otherwise adulterated or injurious to health.

24. The plaintiffs allege that the *Salmonella*-contaminated food that defendant Wright County Egg sold to the plaintiffs would not pass without objection in the trade and was not fit for the ordinary purposes for which such goods are used, and was therefore in breach of the implied warranty of merchantability.

25. The plaintiffs allege that the *Salmonella*-contaminated food that the defendant Wright County Egg sold to the plaintiffs was not fit for the particular uses and purposes intended, *i.e.* human consumption, and that this product was therefore in breach of the implied warranty of fitness for its particular purpose.

WHEREFORE, the plaintiffs request damages in an amount that will reasonably compensate them for the said injuries and damages, together with interest and costs, as permitted under Iowa law.

## V. NEGLIGENCE PER SE

26. The plaintiffs replead the allegations set forth in paragraphs 1 through 25 above and incorporates same as if fully set forth herein.

27. The defendant had a duty to comply with all applicable state and federal regulations intended to ensure the purity and safety of its food product, including, but not limited to, the requirements of the Federal Food, Drug and Cosmetics Act, 21 U.S.C. § 301 *et seq*.

28. The defendant failed to comply with the provisions of the health and safety acts identified above, and, as a result, was negligent *per se* in its manufacture, distribution, and sale of food adulterated with *Salmonella*, a deadly pathogen.

29. As a direct and proximate result of conduct by the defendant that was negligent *per se*, the plaintiffs sustained injuries and damages.

WHEREFORE, the plaintiffs request damages in an amount that will reasonably compensate them for the said injuries and damages, together with interest and costs, as permitted under Iowa law.

## VI.  NEGLIGENCE

30. The plaintiffs replead the allegations set forth in paragraphs 1 through 29 above and incorporate same as if fully set forth herein.

31. The defendant owed a duty to the plaintiffs to use reasonable care in its manufacture, distribution, and sale of its food products, which duty, if met, would have prevented or eliminated the risk that the defendant's food products would become contaminated with *Salmonella* or any other dangerous pathogen. The defendant breached this duty.

32. The defendant had a duty to comply with all statutes, laws, regulations, or safety codes pertaining to the manufacture, distribution, storage, and sale of its food product, but failed to do so, and was therefore negligent. The plaintiffs are among the class of persons designed to be protected by these statutes, laws, regulations, safety codes or provision pertaining to the manufacture, distribution, storage, and sale of similar food products.

33. The defendant had a duty to properly supervise, train, and monitor its employees, and to ensure its compliance with all applicable statutes, laws, regulations, or safety codes pertaining to the manufacture, distribution, storage, and sale of similar food products, but it failed to do so and was therefore negligent.

WHEREFORE, the plaintiffs request damages in an amount that will reasonably compensate them for the said injuries and damages, together with interest and costs, as permitted under Iowa law.

## VII. PUNITIVE DAMAGES

34. The plaintiffs repleads the allegations set forth in paragraphs 1 through 33 above and incorporate same as if fully set forth herein.

35. There is clear and convincing evidence that the defendant acted willfully and wantonly in disregarding the rights and safety of others, including, specifically, the plaintiff. As such, the plaintiff is entitled to an award of punitive damages pursuant to Iowa Code §668A.1 and Iowa law.

36. At all times relevant hereto, the defendant willfully and wantonly operated its egg production facilities with disregard for the potential contamination of its eggs with bacterial pathogens including, but not limited to, *Salmonella*.

37. The violations and food safety deficiencies noted by the FDA in its inspection of the defendant's facility, as noted in paragraphs 9 and 10, above, are evidence of the defendant's willfull and wanton disregard for the rights and safety those who purchased and consumed its egg products, including the plaintiff. The defendant willfully and wantonly operated its plant in a manner where contamination of egg products with *Salmonella* was likely to occur.

38. Furthermore, the defendant has a long history of wanton and willful disregard for the rights and safety of those who purchase and consume its egg products. Beginning in 1982, egg production facilities owned and operated by Austin J. DeCoster, owner of Wright County Egg, have been repeatedly linked to outbreaks of *Salmonella* illnesses, including *Salmonella* enteritidis outbreaks. According to a report in the New York Times, these outbreaks include:

38.1. In 1982, approximately 36 people were sickened, and one person died, in an outbreak of *Salmonella* enteritidis traced to an egg production facility owned and operated by Mr. DeCoster.

38.2 Eggs from the same DeCoster owned facility were suspected as the source of a simultaneous outbreak in Massachusetts that sickened 400 people.

38.3 In 1987, nine people died and roughly 500 were sickened in an outbreak of *Salmonella* enteritidis in New York City by eggs produced by farms owned and operated by Mr. DeCoster.

38.4 In 1992, eggs from Mr. DeCoster's farm in Maryland were the source of a *Salmonella* outbreak in Connecticut.

39. Numerous state and local regulatory agencies—including New York and Maryland—have either banned, quarantined or otherwise limited the sale of eggs from egg production facilities operated by Mr. DeCoster.

40. Records of environmental sample reports from the defendant's facility in and around Galt Iowa from between 2008 and 2010 indicate that Wright County Egg received 426 positive results for *Salmonella,* including 73 samples that were potentially positive for *Salmonella* enteritidis. The testing included 66 positive samples for *Salmonella* on May 27, 2010 alone. The defendant was aware of the continued presence of *Salmonella*, including

*Salmonella* enteritidis, on its grounds, in its equipment, and likely in its egg products, but willfully and wantonly refused to take corrective action.

WHEREFORE, the plaintiffs request punitive damages in an amount to be determined at trial, together with interest and costs, as permitted under Iowa law.

**PRAYER FOR RELIEF**

WHEREFORE, the plaintiffs, Jason and Jennifer Tucker, individually and as parents of J.T., a minor, pray for judgment against the defendant as follows:

a. Judgment for the plaintiffs against the defendant for just compensation in a fair and reasonable amount for the damages above set forth; and

b. Punitive damages in an amount to be proven at trial; and

c. Such additional and/or further relief, including interest, costs, and reasonable attorney fees, as this Court deems just and equitable.

**JURY DEMAND**

The plaintiffs hereby demands a jury trial.

Dated this 26th day of October, 2010.

> Respectfully submitted,
>
> /s/ Steven P. Wandro
> Steven P. Wandro
> Kara M. Simons
> WANDRO, BAER & McCARTHY, P.C.
> 2501 Grand Avenue
> Des Moines, IA 50312
> Telephone: (515) 281-1475
> Facsimile: (515) 281-1474
> E-mail: swandro@2501grand.com
> E-mail: ksimons@2501grand.com

      William Marler, Esq.
      MARLER CLARK, LLP PS
      701 First Avenue, Suite 6600
      Seattle, WA 98104
      Telephone: (206) 346-1888
      Facsimile: (206) 346-1898
      E-mail: bmarler@marlerclark.com

      ATTORNEYS FOR THE PLAINTIFF

Original filed.